NEW BRITAIN BOARD OF EDUCATION,    :
    Plaintiff,    :
    :
v.    :    CIVIL ACTION NO.
    :    3:09-cv-1240 (VLB)
NEW BRITAIN FEDERATION OF    :
TEACHERS, LOCAL 871,    :
    Defendant.    :    November 17, 2010

## MEMORANDUM OF DECISION AFTER TRIAL TO THE COURT

## I. INTRODUCTION

This case arises out of a dispute between the New Britain Board of Education (hereinafter the "Board"), and the New Britain Federation of Teachers, Local 871 (hereinafter the "Union"), regarding class size limits for special education classes contained in the parties' current collective bargaining agreement. The Board seeks the following declaratory, injunctive, and equitable relief: 1) a declaration that the class size limits for special education classes contained in the parties' collective bargaining agreement are illegal, invalid, and unenforceable under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., Connecticut state law implementing the IDEA, Conn. Gen. Stat. § 10-76a et seq. and Connecticut Agencies Regs. § 10-76d-1 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Equal Protection Clause of the United States Constitution; 2) an injunction enjoining the enforcement of such provisions; 3) an injunction enjoining a pending grievance arbitration concerning

enforcement of the provisions brought by the Union; and 4) a declaration that such provisions represent an illegal subject of bargaining for the upcoming negotiations for a successor collective bargaining agreement between the parties.  A bench trial was conducted on September 1st and 2nd and November 1st, 2010.  For the reasons stated below, the Court rules in favor of the Union with respect to all of the Board's claims.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 52(a), in a bench trial, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).  The Court's findings of fact, "whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."  Fed. R. Civ. P. 52(a)(6).

## III. FACTUAL FINDINGS

The Court makes the following findings of fact based upon the parties' stipulations as well as the testimony and documentary evidence offered during the bench trial.  The Board is a body politic and corporate, organized and operated pursuant to Connecticut General Statutes §§10-220, 10-240 and 10-241. See Joint Trial Mem., Doc. #39, at 15.  Furthermore, the Board is the local educational agency responsible for providing students residing within New Britain with a free appropriate public education pursuant to the IDEA and Conn. Gen. Stat. § 10-76a et seq.  Id. at 15-16.  The Union is the exclusive bargaining

representative of all those employees of the Board in positions requiring a teaching or special services certificate, except nurses, paraprofessionals, persons in the "administrators' unit" as defined by Connecticut law and other personnel excluded by state statute for the purpose of negotiating with respect to salary schedules, working conditions, and other conditions relative to employment.  Id. at 16.

The Board and the Union are parties to a collective bargaining agreement (hereinafter the "CBA") that was and is in effect from July 1, 2007 through June 30, 2010.  Pl. Exh. 5.  The CBA was extended by agreement of the parties until June 30, 2011.  Pl. Exh. 6.  Article V of the CBA contains provisions limiting the sizes for academic classes.  Included in this provision are sections governing class size for special education students.  Pl. Exh. 5 at 12-13.  Specifically, Sections 5.3 and 5.4 set forth seven categories with their own specific class size limit, along with limited exceptions thereto and recommendations for the use of paraprofessionals.  Id.  The categories are as follows:

(1)  "Category I" provides a class size limit of 7 students for the following programs:  "DEP - Elementary, DEP - Severe, Pre-school Special Education."

(2)  "Category II" provides a class size limit of 10 students for the following programs:  "DEP - Intermediate, Advanced, Multiple Disability/Physical Disabilities, Self-contained Behavior Class - Grades K.-5, Self-contained Academic/Behavior - Grades K-2, Self-contained Academic - Grades K-2."

(3)  "Category III" provides a class size limit of 12 students for the following programs:  "Self-contained Academic/Behavior - Grades 3-8, Self-contained Academic - Grades 3-5."

(4)  "Category IV" provides a class size limit of 15 students for the following programs:  "Self-contained Behavior - Grades 6-12, Self-contained Academic/Behavior- Grades 9-12, Self-contained Academic - Grades 6-12, Departmentalized Academics - Grades 9-12, IDEA/B - Grades 9-12."

(5)  "Category V" provides a class size limit of 25 students (or 115 student hours) for the following programs:  "Learning Resource, Inclusion Elementary and Middle."

(6)  "Category VI" provides a class size limit of 16 students for the following programs:  "Two full time Special Education Teachers, IDEA High School."

(7) "Category VII" provides a limit of "30 Total contacts (students and teachers)" for the following programs:  "High School Inclusion."

Id.

Section 5.5 of the CBA sets forth procedures for placing any new program in the "proper category" under Section 5.3, with any disagreement between the Board and the Union to be resolved by binding arbitration.  Id. at 13.  The arbitrator will then have the power to decide the appropriate category for the new program.  In addition, Section 5.6 provides:  "When class size exceeds the maximums established hereby up to and including three (3) in categories IV or V, or by up to and including two (2) in categories I, II, III or VI, then the decision of

the Board on appeal shall be final as prescribed in Section 5:7." Id. at 14.

Parenthetically, Section 5.7 sets forth a grievance procedure for resolving class

size disputes between the Board and the Union, with the steps of the procedure

including appeal to the building principal, superintendent, Board of Education,

and under certain circumstances arbitration. Id. at 14-15. Section 5.6 further

provides that "whenever class size exceeds the maximums by more than three (3)

or two (2), respectively, then the decision of the Board on appeal is subject to

binding arbitration." Id. The CBA does not specify the amount of monetary

penalties that may be imposed for violation of the class size limits.

The Union has filed numerous grievances pursuant to the grievance

procedures provided under Article IX of the CBA, alleging that the Board has

violated Article V (including Sections 5.3 and 5.4) and demanding, among other

things, that the Board "[r]eturn to a class size that does not exceed the limits in

the contract. And/or monetary compensation for the classes that exceed

contractual limits." Def. Exh. B. The grievances submitted by the Union for the

2009-10 school year allege that the Board violated Article V of the CBA by

exceeding the class size limits set forth in Categories IV, V, and VII as described

above; there are no grievances relating to the remaining four categories. Def.

Exh. B. The majority of the grievances relate to Category VII. Def. Exh. B. The

Union subsequently invoked arbitration under the CBA's grievance procedures

as to certain of the grievances. Pl. Exh. 8.

The grievance procedures under Article IX of the CBA provide for, *inter

alia*, binding arbitration, which shall be conducted by the American Arbitration

Association ("AAA") in accordance with its rules and procedures. Pl. Exh. 5 at 24-26. Under Article IX, the arbitrator may only hear and decide grievances involving an alleged "violation of, misinterpretation of, misapplication of, or infringement upon the provisions of [the Collective Bargaining] Agreement." Id. at 24. According to Section 9.6 of the CBA, the arbitrator "shall be bound by and must comply with all of the terms of this Agreement" and "shall have no power to add to, delete from, or modify in any way any of the provisions of this Agreement." Id. at 25-26. The decision of the arbitrator shall be binding upon the parties during the life of the CBA. Id. at 26. The cost for the services of the arbitrator and the AAA is borne equally by the Board and the Union. Id.

The Union's President, Ronda Barker, testified that, prior to the 2007-08 school year, grievances for special education class size overages were arbitrated and the Board never objected to having an arbitrator preside over the proceedings. During the 2007-08 school year, many grievances relating to class size overages were filed. Barker participated in meetings with Board representatives, including Dr. Jon Walek, the Board's Director of Special Education, in May of 2008. During the meetings, the two sides discussed problems with scheduling for special education classes. Walek testified that he indicated during these meetings that the CBA language regarding special education class size was "problematic." Barker testified that several Board representatives stated at the meetings that it was "too expensive" to pay class size overages. Barker further testified that the Union went through the IEP's for special education students with the Board and made suggestions regarding class

scheduling.  However, the dialogue ended unsuccessfully, and the Union thereafter filed for arbitration.

There were again special education class size overages for the 2008-09 school year.  The Board agreed to pay for overages in regular education class sizes, but held grievances for special education class size overages in abeyance pending attempts to resolve the issue with the Union.  However, efforts to reach a resolution were again unsuccessful, and the Union filed for arbitration.  The AAA consolidated the grievances from the 2007-08 school year with the grievances for the 2008-09 school year.  The same process repeated for the 2009-10 school year. Walek admitted that the Board never took the position that the special education class size provisions contained in the CBA were illegal until this litigation was commenced in August 2009.

Pursuant to the procedures of the AAA, Eric J. Schmertz was appointed as arbitrator and the arbitration hearing was scheduled to commence on September 22, 2009.  Pl. Exh. 9.  However, the hearing was postponed, and the Union has agreed to have the AAA hold the matter in abeyance pending the outcome of this case.  Pl. Exh. 10.

The Board objects to the arbitration proceedings on the basis that the CBA provisions at issue are in violation of federal and state law protecting the rights of students with disabilities (and their parents).  Joint Trial Mem., Doc. #39, at 19. The Union maintains, however, that the matter is arbitrable and that it has a duty to enforce this and all provisions of its collective bargaining agreement with the Board.  Id.  The Union wishes to proceed with the arbitration of the matter.  Id.

Pursuant to Connecticut General Statutes §10-153b, et seq., negotiations between the Board and the Union for a successor collective bargaining agreement have commenced.  Id. at 20.

The Board designs and implements special education programs for individual students with disabilities though  an Individualized Education Program ("IEP") which contains, *inter alia*, the student's present levels of educational performance, measurable goals, and the educational programs, services, and accommodations to be provided to the student.  See 20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a).  If a student requires special education, the school district must convene a Planning and Placement Team ("PPT") to develop an IEP via an individualized inquiry into the student's needs.  The PPT consists of the student's parents/guardians and appropriate regular and special education personnel, including teachers and evaluators and, at the parents' invitation and retention, other individuals with relevant expertise may participate.  The IEP must be reviewed at least once per school year, and it should be periodically revised in response to information provided by the parents and staff and to ongoing evaluations of the child's progress.  See 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.320 – 300.324; Conn. Agencies Regs. §§ 10-76d-10 – 10-76d-12.  The PPTs typically convene in May or June so as to develop each student's IEP for the ensuing year. In addition to the student's current teacher, the PPT may include regular and special education teachers who would be teaching the student in the ensuing school year.  The IEP does not specifically list the name of the teacher, but does list who will be the services provider for specific services.

New Britain employs an "inclusion" or "mainstreaming" model of special education in which only a small number of special education students receive their instruction solely in a special education classroom. The goal is that 80% of special education students receive instruction in regular education classrooms 80% of the time. Most students with special education needs receive instruction in regular classrooms where the class is "co-taught" by both a regular education teacher and a special education teacher. This is consistent with the IDEA's "least restrictive environment" mandate, pursuant to which children with disabilities must be educated in regular classes with children who are not disabled, unless the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412(a)(5)(A). Thus, special education students are woven throughout all classes, such that there are general education classes with special education teachers assigned to provide services to certain students who need assistance in each particular class. In the Middle School and Ninth Grade Academy, students are clustered in small learning communities, each with four regular education teachers – one of whom teaches English, another Social Studies, another Mathematics, and another Science – along with at least one special education teacher who co-teaches. Contrastingly, for the Tenth through Twelfth grades, students choose from a broad range of classes to earn the twenty credits required for graduation, which must include the requisite number of credits in specified disciplines. For the 2009-2010 school year, there were more than 500 students at New Britain High School with special education needs. The

large number of students and class choices results in a large, but undefined and unspecified number of group permutations.

The class size provisions at issue in this case, with the exception of Category VII, have appeared in collective bargaining agreements between the Board and Union since at least 1995. <u>See</u> Pl. Exh. 1-5. Category VII was first included in the collective bargaining agreement for the parties covering the period from 2001 to 2004 (Pl. Exh. 3), and was based upon a grievance arbitration award on special education class size issued by Virginia W. Dethy on January 30, 1996. Pl. Exh. 12. None of the Board's witnesses in this case played any role in drafting or negotiating the special education class size provisions. Indeed, the Board's witnesses consistently testified that they lack an understanding of what the terminology included in the various categories contained in Section 5.3 means.

Barker was, however, able to elaborate upon the meaning of the categories to a certain extent. She explained that Category I, which provides a class size limit of 7, applies to students at the elementary school level with severe disabilities who require special attention. Categories II through IV apply to students at various grade levels with disabilities in academic or behavioral areas, or both, in "self-contained" classes, meaning classes consisting of only special education students. Category V, which provides a class size limit of 25, applies to students in a "learning resource" class, which is a class that students with special education needs who have been "mainstreamed" into the general student population attend for part of the day in order to obtain additional help with their

schoolwork.  Category VI, which provides a class size limit of 16 students, applies to a program at New Britain High School called the "Individual Development Educational Alternative," which is a class co-taught by two teachers that is designed for students with long-term emotional or mental illnesses.

As noted above, Category VII has been the subject of the majority of grievances for oversize classes.  Unlike the other six categories, Category VII does not impose a limitation on the total number of special education students who may be placed in a particular class.  Instead, Category VII imposes a limit of 30 "contacts" for teachers providing educational support to students who are taught in "inclusion" classes at New Britain High School, which are classes in which special education students are taught alongside their general education peers in a regular classroom.

The Board's witnesses testified that an inclusion class consists of no more than 50% special education students.  Because special education services are provided on the basis of a student's need as outlined in his or her IEP, a particular student may be designated as a special education student for certain classes, but not for others.  Thus, for instance, a student may have a need for special services in English class, but not Mathematics class.  In such a scenario, the student would only be considered a special education student in English class.  Normally, inclusion classes are "co-taught" by both a general education teacher and a special education or "inclusion teacher," who is responsible for ensuring that special education students in that particular class receive the services required by their IEPs.  A paraprofessional may also be assigned to a

special education class depending upon the needs of the special education students in that class.

The term "contacts" as used in Category VII refers to the total number of special education students combined with the total number of teachers with whom an inclusion teacher consults during the course of a day. By way of illustration, if a special education teacher co-teaches five inclusion classes with five different general education teachers, each of which contains five special education students, his or her total number of contacts would be 30 (25 special education students plus five general education teachers). Likewise, if another special education teacher co-teaches five inclusion classes with the same general education teacher in each class, and each class contains five special education students, his or her total number of contacts would be 26 (25 special education students plus one general education teacher).

Special education teachers at New Britain High School also serve as "case managers" with a caseload of approximately 10 to 15 special education students each. Case managers are generally responsible for ensuring the success of each student assigned to their caseload. Their particular duties include ensuring that students' schedules align with their needs as required by their IEPs, attending PPTs and assisting to develop IEPs, consulting with teachers regarding students' academic and attendance issues, acting as a liaison for students, and addressing problems that may arise regarding transportation, parents, or other issues. The duties performed by teachers in their capacity as case managers are separate and distinct from the duties they perform in their capacity as special education

teachers for particular classes. Case managers spend approximately 3.75 total hours per week on case management functions for all of the students assigned to their caseload combined. None of the duties performed by special education teachers in their capacity as case managers count toward their "contacts" for purposes of Category VII.

The Board's witnesses described the process used for assigning special education students to classes and ensuring that they received the services required by their IEPs for the 2009-10 and 2010-11 school years. The Board did not present evidence regarding how the scheduling process occurred prior to the 2009-10 school year. Anne Marie Niedzwiecki, Coordinator of Special Education and Speech/Language Services for the New Britain School District (the "District"), testified that, upon beginning her job in July 2008, she was tasked with the responsibility of reviewing the IEPs for all special education students at New Britain High School to ensure that they were receiving the appropriate services. Upon reviewing over 450 IEPs, she discovered numerous discrepancies between the services that special education students were supposed to be receiving and the services they were actually receiving. To remedy the errors, she testified that in May 2009 she created an excel spreadsheet listing the services that each special education student was to receive, based upon their IEPs, for the upcoming 2009-10 school year. Based upon the data included in the spreadsheet, she determined the number of inclusion classes that were needed and the types of services that would have to be provided in each class. She provided this information to Steven Strand, Assistant Principal at New Britain

High School.  Strand created a master schedule for all New Britain High School students which incorporated this information.  Strand did not testify and no other evidence was introduced establishing what if any effort was made to comply with the class size limits to which the Board agreed in the CBA or that such efforts were unavailing.  Niedzwiecki also testified that she neither understood nor attempted to determine whether class assignments could meet both student needs and class size limits as she never attempted to comply with the class size provisions of the CBA.

Rebecca Deddona, District Supervisor for Special Education, was also critically involved in scheduling for special education students at New Britain High School.  Deddona began her job with the District in July 2009.  Her role in scheduling for the 2009-10 school year was to check the class schedule for all special education students against their IEPs, and to ensure that all services required by the IEPs also appeared in the schedules.  Subsequently, for the 2010-11 school year, Deddona testified that she too created an excel spreadsheet, as Niedzwiecki had done the previous year, which listed the services that each special education student was to receive based upon their IEPs.  She then prepared a schedule for special education students.  The schedule provided instructions regarding the number of sections that would be needed for each particular class, including both inclusion classes and self-contained classes, based upon the number of students who had requested the class and the level of need of those students.  Deddona explained that, if students in a particular class had a higher level of need, she would create an additional section or place

another paraprofessional in the class.  Deddona also testified that she made no effort to meet the class size limits contained in the CBA.  After Deddona completed the schedule for special education students, Strand again created a master schedule for all students at New Britain High School which incorporated the information provided by Deddona.  Again, there is no evidence of the role if any that the CBA played in that process, but Attorney Sommaruga, counsel for the Board, stated during the trial that the Board made no effort to comply with the CBA.

The Board failed to present any evidence or claim of any student ever having been denied services called for by his or her IEP as a result of the class size provisions contained in the CBA.  Each of the Board's witnesses testified repeatedly that the CBA class size language was not considered when determining the class schedule for special education students, and that no effort was made to comply with the class size limits.  Instead, the schedule was based solely on students' needs as required by their IEPs.  The Union was not consulted and played no role in developing the class schedule for the 2009-10 and 2010-11 school years.

The Board's witnesses testified that it would be difficult to comply with the special education class size provisions contained in the CBA, and particularly Category VII, because of the IDEA's "least restrictive environment" mandate, which creates a presumption that special education students are to be placed in general education classrooms with supplemental aids and services.  However, the Board was unable to illustrate this assertion or state with particularity why its

conclusory assertion was in fact true. On the contrary, the evidence presented at trial indicated that the problem is largely one of resources and could be remedied by adding class sections and teachers. To that end, Deddona testified that she has the authority to add additional class sections, and that doing so would have the effect of reducing the total number of special education students in each class and thus reducing the number of "contacts" for special education teachers for purposes of Category VII as well as reducing the student-teacher ratio with respect to the other categories. Nothing in the CBA prevents the Board from adding additional sections. Instead, Deddona explained, the primary impediment to doing so is a lack of resources. Deddona admitted that, with "additional teachers and classrooms," it would be possible to comply with the inclusion requirements of the IDEA and state law while also comporting with the CBA class size provisions. Further, adding additional sections would have the benefit of reducing class sizes at New Britain High School from the current standard of 30-32 students which, according to educational theory, may benefit all students in general.

Niedzwiecki was also questioned regarding the issue of whether hiring more teachers would solve the class size overage problems at New Britain High School and permit scheduling for special education students to be done in a manner that complies with both the CBA class size provisions and with federal and state law. Niedzwiecki was evasive, testifying that she was not able to definitively say one way or the other because that would be "trying to predict into the future." She admitted, however, that there would likely be "other issues,"

including "building use, how many teachers actually have the rooms at the high school, [and] the practicality of it," all of which are resource rather than educational or legal issues.

When recalled as a rebuttal witness, Niedzwiecki testified that none of the class compositions for students in the Tenth through Twelfth grades proposed by the Union would satisfy the requirements of the IDEA because they would deprive special education students of the class choices available to non-special education students. However, her testimony was conclusory and unsupported by the facts. The curriculum at New Britain High School is divided into four levels of instruction: college level, which are classes for students capable of doing college level work and have the necessary prerequisites; honors level, which are college preparatory classes available to academically talented students; accelerated level, which are classes for students who want to work at a more challenging pace than the standard level; and standard level, which are classes for students who may need additional support in literacy and math skills. See Doc. #55, Program of Studies for New Britain High School for school years 2007-08, 2008-09, 2009-10, and 2010-11. There are limited course offerings at the standard level, with the vast majority of courses being offered at the other three levels. Id. In order to accept Niedzwiecki's claim, the Court would have to make a presumption that special education students would naturally be distributed across course offerings at all four levels of instruction. However, no such evidence was presented at trial. To the contrary, the testimony of the Board's witnesses suggested that, as a general matter, students designated as special

education students for a particular subject would not appropriately be assigned to college, honors, or accelerated level courses in that subject.  Instead, such students would likely be assigned to standard level courses, for which course offerings are quite limited.

Further, under New Britain High School's drop policy, students are not permitted to change or drop classes at the beginning of the school year in the fall.  Id.  Instead, they must wait until after the first progress report if they feel they have been misplaced to move down one level, and even then, such a change requires the teacher's attestation that the student put forth his or her best effort. Id.  This policy likely has the effect of discouraging students from choosing courses that may prove challenging for them.  Therefore, it would appear that the course offerings available to special education students are inherently constrained by New Britain High School's curriculum and limited drop policy, and the Court assigns little weight to Niedzwiecki's testimony regarding the purported effect of the CBA class size provisions on student choice.

## IV. CONCLUSIONS OF LAW

### A. Arbitrability

The Board asserts that this action arises under federal law and therefore invokes this Court's jurisdiction pursuant to 28 U.S.C. § 1331.  The Union contests this Court's jurisdiction on the basis that the instant dispute is subject to arbitration pursuant to the CBA.  Therefore, the Court must address arbitrability as a threshold matter.

Where, as here, a contract contains an arbitration clause, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"  AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650 (1986) (quoting United Steelworkers of Am. V. Warrior & Gulf Nav. Co., 363 U.S. 574, 582-583 (1960)).  However, "the presumption is reversed when the question is whether the issue of arbitrability is subject to arbitration.  The determination of arbitrability is left to the court unless the parties 'clearly and unmistakably' indicate otherwise."  First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).  This rule also applies under Connecticut law. See Welch Group, Inc. v. Creative Drywall, Inc., 215 Conn. 464, 467 (1990) ("Whether a particular dispute is arbitrable is a question for the court, unless, by appropriate language, the parties have agreed to arbitrate that question, also.").

In this case, the parties expressly agreed to arbitrate grievances involving an alleged "violation of, misinterpretation of, misapplication of, or infringement upon the provisions of [the Collective Bargaining] Agreement."  Pl. Exh. 5 at 24. This language encompasses violation of the special education class size provisions, contained in Sections 5.3 and 5.4 of the CBA, which are at issue in this case.  Id. at 12.  The Board contends, however, that the special education class size provisions violate federal and state law, and therefore are not a proper subject for arbitration.

If a contract provision "is unenforceable and void, it should not and cannot form the basis for any arbitration award, irrespective of the holding of the arbitrator, and the mere submission of the controversy to arbitration would compound the statutory violation." McLeod v. American Federation of Television & Radio Artists, 234 F. Supp. 832, 841 (S.D.N.Y.1964). "In other words, if the clause is void and unenforceable it was void and unenforceable as of the time of its insertion into the contract and, ipso facto, cannot be the basis of any breach of the collective bargaining agreement." Id. As the Second Circuit has explained,

> Where a contract clause calls for a result inconsistent with [federal law] and the jurisdiction of an arbitrator provided for by the contract is restricted, as here, to "disputes relating to the Interpretation or Performance of this Agreement", resort to arbitration may be futile since it is not at all clear that the arbitrator may disregard the plain provisions of the contract.

Danielson v. International Organization of Masters, Mates and Pilots, AFL-CIO, 521 F.2d 747, 755 (2d Cir. 1975); see also Policeman's & Firemen's Retirement Board v. Sullivan, 173 Conn. 1, 12 (1977) (upholding entry of injunctive relief prohibiting union from proceeding with arbitration where the matter in dispute was not subject to arbitration under the parties' collective bargaining agreement). Accordingly, if the Plaintiff's position that the special education class size provisions are unlawful is correct, it would be improper to submit the Union's grievances regarding class size overages to arbitration. If, however, the special education class size provisions do not violate any federal or state law, the grievances at issue are clearly arbitrable. Thus, the Court must address the

ultimate issue of the legality of these provisions before the question of arbitrability may be decided.

### B. Legality of Special Education Class Size Provisions

The Board contends that class size provisions for special education classes contained in the CBA are illegal, invalid, and unenforceable under the IDEA, Connecticut state law, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Equal Protection Clause of the United States Constitution.

The IDEA, 20 U.S.C. §1400, et seq., was adopted in 1975 to ensure that all children with disabilities have available to them a free appropriate public education, including the provision of special education and related services designed to meet their unique needs. The United States Department of Education has adopted regulations to implement the IDEA, as amended from time to time. See 34 C.F.R. § 300.1 et seq. The IDEA mandates that, to the maximum extent appropriate, "children with disabilities [must be] educated in regular classes with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [may occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2)(i). "Educating a handicapped child in a regular education classroom . . . is familiarly known as 'mainstreaming.'" P. v. Newington Board of Educ., 546 F.3d 111, 119 (2d Cir. 2008). The Second Circuit has underscored the

IDEA's "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers."  Id. Nevertheless, "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students.  Under the [IDEA], where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming in inappropriate."  Id.

As required by federal law, Connecticut has adopted a statutory scheme and administrative regulations implementing the provisions of the IDEA.  See Conn. Gen. Stat. § 10-76a et seq.; Conn. Agencies Regs. § 10-76d-1 et seq. Educational programs for students with disabilities are designed and implemented through an IEP which contains the student's present levels of educational performance, measurable goals, and the educational program and services and accommodations to be provided to the child.  20 U.S.C. § 1414(d)(1)(A); 34 C.F.R. § 300.320(a).  The IDEA and implementing federal and state regulations set forth procedures intended to provide a framework for developing an appropriate IEP in light of a student's needs and abilities and ensuring parents' participation in the ongoing development of their child's educational program.  Pursuant to these procedures, if a student requires special education, a school district must convene a PPT to develop an IEP via an individualized inquiry into the child's needs.  The PPT consists of the student's parents/guardians and appropriate regular and special education personnel, including teachers and evaluators, and parents may invite other individuals with

relevant expertise to participate.  The IEP must be reviewed at least once per year, and it should be periodically revised in response to information provided by the parents and staff and to ongoing evaluations of the child's progress.  <u>See</u> 20 U.S.C. § 1414(d); 34 C.F.R. §§ 300.320 – 300.324; Conn. Agencies Regs. §§ 10-76d-10 – 10-76d-12.

The United States Supreme Court has specifically rejected the contention that the "appropriate education" mandated by the IDEA requires states to "maximize the potential of handicapped children."  <u>Bd. of Educ. of the Hendrick Cent. Sch. Dist., Westchester County v. Rowley</u>, 458 U.S. 176, 197 n.21 (1982).  The purpose of the IDEA was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."  <u>Id.</u> at 192.  Nevertheless, the "door of public education" must be opened for a disabled child in a "meaningful" way.  <u>Id.</u>  This is not done if an IEP affords the opportunity for only "trivial advancement."  <u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1121 (2d Cir. 1997) (citations omitted).  Instead, an appropriate education under the IDEA is one that is "likely to produce progress, not regression."  <u>Cerra v. Pawling Cent. Sch. Dist.</u>, 427 F.3d 186, 195 (2d Cir. 2005) (quoting <u>Walczak v. Florida Union Free Sch. Dist.</u>, 142 F.3d 119, 130 (2d Cir. 1998)).

Section 504 of the Rehabilitation Act and the Americans with Disabilities Act ("ADA") also provide that students with disabilities must receive an appropriate education in the least restrictive environment, with similar procedural safeguards as those provided under the IDEA.  <u>See</u> 34 C.F.R. §§ 104.33 through

104.36; 29 U.S.C. § 794; 42 U.S.C. § 12132; 28 C.F.R. § 35.130; <u>see also</u> <u>Molly v. Lower Merion School Dist.</u>, 194 F. Supp. 2d 422, 426 (E.D. Pa. 2002) ("The substantive requirements of the Rehabilitation Act in the education context are equivalent to the requirements set forth in the Individuals with Disabilities Education Act[.]").

Although the IDEA does not contain an explicit defense of undue burden, as the ADA and regulations implementing the Rehabilitation Act do, <u>see</u> 42 U.S.C. § 12112(b)(5)(A) and 28 C.F.R. § 41.53, some courts have noted that such a defense is "implicit in the statutory concepts of an 'appropriate' education and 'related' services." <u>Morton Cmty. Unit Sch. Dist. No. 709 v. J.M.</u>, 152 F.3d 583, 586 (7th Cir. 1998) (stating that at some point the expense of providing a service to a severely disabled child during the school day "is so disproportionate to any plausible educational objective for the child that the expense should not be considered a component of an appropriate education for a severely disabled child or a service reasonably related to such an education"); <u>accord</u> <u>Lunceford v. District of Columbia Bd. of Educ.</u>, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (because public "resources are not infinite," federal law "does not secure the *best* education money can buy; it calls upon government, more modestly, to provide an *appropriate* education for each child") (emphasis in original).

The Second Circuit has adopted a two-pronged approach to be used in determining whether an IEP satisfies the requirements of the IDEA, pursuant to which a court should consider, "first, whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for

24

a given child, and if not, then whether the school has mainstreamed the child to the maximum extent appropriate." P. v. Newington, 546 F.3d at 120 (citation omitted; quotation marks omitted). This determination involves "an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it, ever mindful of the IDEA's purpose of educating children with disabilities, 'to the maximum extent appropriate,' together with their non-disabled peers." Id.

The Board's position in this case is that the special education class size limits in the CBA interfere with the least restrictive environment and individualized placement mandates of the IDEA, and the similar protections provided by Section 504 of the Rehabilitation Act and the ADA, by requiring the Board to place students by category in an educational setting other than the setting they would be placed in but for the class size limits. See Pl. Proposed Conclusions of Law, Doc. #39-1, at 26. According to the Board, the CBA forces educational personnel to choose between complying with the CBA and satisfying their statutory duty to provide disabled students with public education in the least restrictive environment appropriate based upon an individualized inquiry of students' needs by limiting the number of special education students in each class depending upon the extent of their disabilities and associated needs.

However, the Board's position is not borne out by the evidence adduced at trial. The Board's witnesses each testified repeatedly that the CBA class size language was not considered when determining placement for special education students, and the Board has admitted that it has made no effort to comply with

25

the class size limits.  Instead, the class schedule during the years in which the subject grievances were filed was determined solely based upon the needs of special education students as reflected in their IEPs.  The Board did not present any evidence of any student in the New Britain school system ever to have asserted, much less actually been denied services required by his or her IEP as a result of the class size provisions contained in the CBA.  Therefore, the Board has not shown that the class size provisions at issue have actually resulted in a violation of federal and state law.

Nevertheless, the Board claims in essence that the CBA class size provisions have placed it between Scylla and Charybdis – if it complies with the CBA, it will be in violation of federal and state law concerning special education; if it does not comply with the CBA, it will be required to pay hundreds of thousands of dollars to special education teachers for class size overages. However, the Board's assertion that complying with the CBA will necessarily result in it violating special education law is highly conjectural.

First, as noted above, the Board admitted that it makes no effort to comply with the special education class size limits contained in the CBA, and thus its contention that compliance would result it being unable to schedule classes for special education students based upon the services required by their IEPs is merely hypothetical.

Further, the testimony offered by the Board's witnesses at trial established that the Board could in fact comply with the class size limits if it were to create additional sections for special education inclusion classes and to hire additional

teachers.  The Board presented no evidence to suggest that it would be impossible for it to add sections and teachers based upon a lack of funding or for any other reason, and therefore there is nothing before this Court to suggest that doing so is not a viable option.  While financial considerations may affect what constitutes an "appropriate" education, the Board has presented little or no facts to support a conclusion that they do here.  Similarly, although the Board's witness claimed that complying with the CBA would limit the class choices available to special education students, there is insufficient evidence to support this claim and, in fact, the evidence suggests that class choices are inherently limited by the curriculum and the class selection policies and procedures of New Britain High School rather than by the CBA.  See Doc. #55, Program of Studies for New Britain High School for school years 2007-08, 2008-09, 2009-10, and 2010-11.

Finally, the Board's contention that the special education class size provisions are illegal is contradicted by legal precedent and the history of collective bargaining negotiations between the parties.  The evidence before the Court demonstrates that the class size provisions at issue in this case, with the exception of Category VII which was first included in 2001, have appeared in collective bargaining agreements between the Board and Union since at least 1995.  See Pl. Exh. 1-5.  However, the Board never voiced any objection at all to the class size provisions until spring 2008, and never claimed that the provisions were illegal until it initiated this lawsuit in August 2009.  Instead, the Board, which is a sophisticated entity which was represented by counsel in its negotiations with the Union, continually approved the class size provisions in each iteration of

the collective bargaining agreement, and extended them for an additional year until June 30, 2011.

Nevertheless, the Board now claims that the special education class size provisions are anachronistic, having been developed before the IDEA was enacted and thus before it was required to follow the modern "mainstreaming" model of special education and the "least restrictive environment" mandate. However, there is nothing inherent about the class size provisions that require disabled students to be placed in classes categorically based upon their disability or for any other arbitrary reason.  To the contrary, Category VII, which limits the number of teacher "contacts" rather than the number of disabled students in any particular inclusion class, was specifically designed in order to provide sufficient flexibility to ensure that the needs of special education students at New Britain High School can be met within the framework of the inclusion model.  The remaining class size provisions place a maximum limit on the number of special education students who may be placed in various types of pull-out classes, but the CBA imposes no requirement that disabled students be removed from the regular classroom for any period of time if doing so would be inconsistent with their IEPs, nor does it mandate that any particular number of classes be created for special education students.  Therefore, the evidence before the Court supports the Union's position that the special education class size provisions govern the workload of teachers who provide special education services, and have no inherent impact on the placement of disabled students,

which is determined based upon their particular needs as required by federal and state law.

At trial, the Board cited the Second Circuit's decision in <u>P. v. Newington</u> for the proposition that categorical or statistical guidelines that predetermine or affect the placement of disabled students violate the IDEA's requirement that an individualized approach be taken as to each student.  In <u>P. v. Newington</u>, the parents of a learning disabled student who suffered from Down Syndrome, hearing impairment, and other significant health problems brought suit against the Newington Board of Education, contending that the student's IEP for the 2005-06 school year did not include enough regular classroom time and therefore did not place him in the least restrictive environment as mandated by the IDEA. 546 F.3d at 113-14.  The IEP in question provided that the student would be educated in the regular classroom 74% of the time, that he would receive supplemental assistance while in the regular classroom, that he would be removed from the regular classroom when necessary to "increase his focus/attention" or to address behavioral issues, and that his regular and special education teachers would consult on a weekly basis.  <u>Id.</u> at 117-18.  Both the administrative hearing officer and the district court found that the IEP complied with the requirements of the IDEA.  <u>Id.</u> at 117-18.

On appeal, the parents challenged that finding, arguing that a presumption should be adopted that a disabled student should be placed in a regular classroom 80% of the time, based upon a class action settlement in which the Connecticut State Department of Education agreed that it would be a "desired

outcome" for disabled students to spend 80% of their time in classes with non-disabled students.  <u>Id.</u> at 122.  The Second Circuit rejected this argument, finding that such a presumption would be inconsistent with the IDEA's objective of providing an education appropriately tailored to each disabled student's particular needs.  <u>Id.</u> at 122.  The Second Circuit noted that "the objective of providing an education tailored to each student's particular needs does not admit of statistical generalizations."  <u>Id.</u>  Applying the two-pronged test cited above pursuant to which a court must consider whether a student can be educated in the regular classroom with supplemental aids and services and, if not, whether the student has been mainstreamed to the maximum extent appropriate, the Second Circuit held that the school had fulfilled its duty under the IDEA to craft a tailored educational plan that included the student in regular classes to the maximum extent appropriate.  <u>Id.</u>

The <u>P. v. Newington</u> case provides no support for the Board's position here.  <u>P. v. Newington</u> stands for the proposition that schools must develop IEPs for disabled students that are appropriately tailored to each student's specific needs, rather than based upon an arbitrary statistical generalization regarding the appropriate percentage of time that a disabled student should spend in a regular education classroom.  As discussed above, the Board presented insufficient evidence at trial to support its claim that it is incapable of complying with this mandate because of the special education class size provisions in the CBA, and was unable to identify any student in the New Britain school system who has ever been denied appropriate services as a result of those provisions.

This case is also unlike <u>Kalliope v. New York State Dep't</u>, - F. Supp. 2d -, 2010 WL 2243278 (E.D.N.Y. June 1, 2010), where the district court held that the plaintiffs stated a plausible claim that the New York State Department of Education ("NYSED") violated the IDEA by promulgating a policy prohibiting the use of a particular student-teacher ratio.  In <u>Kalliope</u>, the plaintiffs alleged that the NYSED's policy prevented the School for Language and Communication Development ("SLCD") from utilizing a 12:2:2 student-teacher staffing ratio – meaning a class with twelve students, two teachers, and two teacher's aides – even though their children's IEPs recommended this class ratio.  <u>Id.</u> at *2.  The plaintiffs further alleged that the NYSED directed Committees on Special Education ("CSE") to change IEPs for reasons other than the unique needs of children and that the NYSED interfered with children's access to the SLCD, even though the CSEs had determined that SLCD was the appropriate educational placement for the children.  <u>Id.</u> at *9.  The NYSED moved to dismiss, arguing that the plaintiffs had failed to state a claim on which relief could be granted.  The district court denied the motion to dismiss, finding that the plaintiffs plausibly stated a claim that the NYSED failed to comply with the IDEA's procedural and substantive requirements because its policy preventing CSE members from even considering the appropriateness of a 12:2:2 class size ratio could constitute an illegal "predetermination" and could interfere with the IEPs and thereby hamper the progress of the plaintiffs' children and other children attending the SLCD.  <u>Id.</u> at *9-10.  Here, by contrast, there is no evidence that the class size limits contained in the CBA interfered in any way with the IEPs of students in the New

31

Britain school system. Instead, the Board's witnesses consistently testified that the class schedule was created so as to implement the IEPs of special education students, and no evidence was produced of any student having failed to receive the services required by his or IEP. Therefore, the Board has identified no valid reason why it cannot comply with both the IDEA and the class size provisions that it bargained for, and its claim under the IDEA and corresponding federal and state law fails.

Finally, the Board argues that the special education class size provisions violate the Equal Protection Clause of the United States Constitution because they mandate that students be treated differently based on their disability status and category. "Where disability discrimination is at issue, the Fourteenth Amendment only proscribes government conduct for which there is no rational relationship between the disparity of treatment and some legitimate governmental purpose." Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F.3d 98, 109 (2d Cir. 2001). "Indeed, 'so long as [a state's disparate] actions' are rationally related to a legitimate purpose, no Fourteenth Amendment violation is presented even if the actions are done 'quite hardheadedly' or 'hardheartedly.'" Id. (quoting Board of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 367-68 (2001)).

The Board has failed to present any evidence to support an Equal Protection claim in this case. The evidence presented at trial demonstrated that, to the extent that disabled students at New Britain High School are treated differently than their non-disabled peers, that differential treatment is based upon their particular needs as determined by their IEPs and as required by the IDEA.

32

Further, the class size and contact limits of the CBA are designed to assure student-teacher ratios that allow for the effective delivery of teaching services to students and this is rationally related to the school's pedagogical purpose. Although the Board contends that it would be unable to schedule students based upon their IEPs if it had to comply with the special education class size provisions, as discussed above, it has failed to prove this claim.

Accordingly, because the Board has failed to meet its burden of proving that the special education class size provisions at issue in this case are illegal, its request for declaratory and injunctive relief is denied. The parties are directed to proceed to arbitration in accordance with Section 9.6 of the CBA.

## IV. <u>CONCLUSION</u>

Based upon the above reasoning, the Court holds that the Board has failed to prove that the special education class size limits contained in its collective bargaining agreement with the Union violate federal and state law concerning students with disabilities. Accordingly, the Court rules in favor of the Union with respect to all of the Board's claims. The Clerk is directed to enter judgment for the Union, and to close this case.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: November 17, 2010.